IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 13-1016

---

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

MICHAEL E. MANNING,

       Defendant-Appellant.

---

Appeal from the United States District Court
for the Eastern District of Missouri
District Court No. 4:12CR-00103 CEJ

The Honorable Carol E. Jackson
United States District Judge Presiding

---

**BRIEF OF DEFENDANT – APPELLANT**

---

Kenneth R. Schwartz
7751 Carondelet Avenue
Suite 204
St. Louis, Missouri 63105
(314) 863-4444

Attorney for Defendant-Appellant Manning

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

The government charged Manning in a two-count superseding indictment with receipt and possession of child pornography, a violation of 18 U.S.C. § 2252A(a)(2) and 18 U.S.C. § 2252A(a)(5)(B), respectively. Following a jury trial, the jury convicted Manning on both counts. At the December 11, 2012 sentencing hearing, Honorable Carol E. Jackson rejected Manning's objections to the Presentence Investigation Report and imposed a 360-month sentence, the maximum sentence allowed under the statutes.

Manning appeals the sufficiency of the evidence to convict him on both counts, the conviction on both counts as double jeopardy, various evidentiary rulings as an abuse of discretion, and the sentence as an abuse of the district court's discretion and requests fifteen (15) minutes of oral argument.

Appellate Case: 13-1016    Page: 2    Date Filed: 03/27/2013 Entry ID: 4018910

# TABLE OF CONTENTS

SUMMARY AND REQUEST FOR ORAL ARGUMENT.................................. ii

TABLE OF CONTENTS................................................................... iii

TABLE OF AUTHORITIES .............................................................. v

JURISDICTIONAL STATEMENT ...................................................... vii

STATEMENT OF ISSUES ................................................................ viii

STATEMENT OF THE CASE............................................................ 1

STATEMENT OF FACTS ................................................................. 2

SUMMARY OF ARGUMENT ............................................................ 31

STANDARD OF REVIEW ................................................................ 32

ARGUMENT:

    I.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT MANNING OF RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY BEYOND A REASONABLE DOUBT…………………………………………………..33

    II.    THE CONVICTIONS FOR BOTH RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY CONSTITUTES DOUBLE JEOPARDY…………………..…………………...……………..44

    III.    THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING THE CHAT TRANSCRIPT INTO EVIDENCE OVER MANNING'S HEARSAY OBJECTION……………...……………45

    IV.    THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING THE MEMOREX CD-R INTO EVIDENCE OVER MANNING'S CHAIN OF CUSTODY OBJECTION…………………………………………………..50

Appellate Case: 13-1016    Page: 3    Date Filed: 03/27/2013 Entry ID: 4018910

V. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING A SUBSTANTIVELY UNREASONABLE SENTENCE ON MANNING……………………………………...………53

CONCLUSION ...................................................................................58

PROOF OF SERVICE ......................................................................59

CERTIFICATE OF COMPLIANCE...................................................59

ADDENDUM ....................................................................................60

Appellate Case: 13-1016    Page: 4    Date Filed: 03/27/2013 Entry ID: 4018910

# TABLE OF AUTHORITIES

## CASES CITED

*United States v. Starr*, 533 F.3d 985 (8th Cir. 2008)..........................................37, 38

*United States v. Koch*, 625 F.3d 470 (8th Cir. 2010)..........................................40, 41

*United States v. Acosta*, 619 F.3d 956 (8th Cir. 2010) ............................................41

*United States v. Muhlenbruch*, F.3d 987 (8th Cir. 2011) ................................42, 43

Blockburger v. United States, 284 U.S. 299 (1932) .................................................42

*United States v. Bobb*, 577 F.3d 1366 (11th Cir. 2009).........................................42

*United States v. Miller*, 527 F.3d 54 (3rd Cir. 2008)...............................................42

*United States v. Davenport*, 519 F.3d 940 (9th Cir. 2008)...............................42, 43

Bourjaily v. United States, 483 U.S. 171 (1987) ......................................................45

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................51, 56

*United States v. Bain*, 586 F.3d 634 (8th Cir. 2009) ..............................................51

*United States v. Haack*, 403 F.3d 997 (8th Cir. 2005)...........................................51

*United States v. Cruikshank*, 667 F.Supp.2d 697 (S.D.W. Va. 2009)....................54

*United States v. Dorvee*, 616 F.3d 174 (2nd Cir. 2010) .........................................54

## STATUTES

18 U.S.C. § 2252A(a)(2)....................................................................................1, 31, 32

18 U.S.C. § 2252A(a)(5)(B) ........................................................................1, 28, 29, 39

18 U.S.C. § 2252A(b)(1)...........................................................................................28

Appellate Case: 13-1016    Page: 5    Date Filed: 03/27/2013 Entry ID: 4018910

18 U.S.C. § 2252A(b)(2).................................................................28, 29

18 U.S.C. § 3553(a) ...............................................................52, 53, 54, 56

## SENTENCING GUIDELINES

U.S.S.G § 2G2.2............................................... 27, 52, 53, 54, 55, 56

U.S.S.G § 2G2.2(a)(2) ................................................................27

U.S.S.G § 2G2.2(b)(2) ................................................................27

U.S.S.G § 2G2.2(b)(3)(B)............................................................27

U.S.S.G § 2G2.2(b)(4) ................................................................28

U.S.S.G § 2G2.2(b)(5) ................................................................28

U.S.S.G § 2G2.2(b)(6) ................................................................28

U.S.S.G § 2G2.2(b)(7)(D)...........................................................28

U.S.S.G § 3D1.2(d).....................................................................27

## OTHER CITATIONS

Federal Rules of Evidence 104(a)................................................45

Federal Rules of Evidence 801(c)................................................44

Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the*

*Flawed Progression of the Child Pornography Guidelines*

(July 3, 2008) ............................................................................52, 53

Appellate Case: 13-1016    Page: 6    Date Filed: 03/27/2013 Entry ID: 4018910

United States Sentencing Commission, U.S. Sentencing Commission's 2010

Sourcebook of Federal Sentencing Statistics.............................................................55

United States Sentencing Commission, Use of Guidelines and Specific Offense

Characteristics: Fiscal Year 2010 ...........................................................................55

M. Schanzenbach & Tiller, *Reviewing the Sentencing Guidelines: Judicial Politics, Empirical Evidence and Reform*, 75 U. Chi. L. Rev. 715 (2008) ………..……….55

Appellate Case: 13-1016     Page: 7     Date Filed: 03/27/2013 Entry ID: 4018910

## Jurisdictional Statement

Manning was charged with one count of receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Jurisdiction in the trial court was based on 18 U.S.C. § 3231, as Manning was charged with an offense against the laws of the United States. He was convicted on September 7, 2012, and sentence was imposed on December 11, 2012. Manning filed a timely appeal on December 20, 2012. This court's jurisdiction is based on 28 U.S.C. § 1291, which provides for jurisdiction over a final judgment from a U.S. District Court.

Appellate Case: 13-1016     Page: 8     Date Filed: 03/27/2013 Entry ID: 4018910

<u>STATEMENT OF ISSUES</u>

I.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT MANNING OF
      RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY BEYOND A
      REASONABLE DOUBT.
      U.S. v. Starr,  533 F.3d  985 (8th Cir. 2008) by contrast
II.   THE CONVICTIONS FOR BOTH RECEIPT AND POSSESSION OF
      CHILD PORNOGRAPHY CONSTITUTES DOUBLE JEOPARDY.
      U.S. v. Muhlenbruch,  643 F.3d 987 (8th Cir. 2011)
III.  THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING
      THE CHAT TRANSCRIPTS INTO EVIDENCE OVER MANNING'S
      HEARSAY OBJECTION.
      FRE  E 801(c)
IV.   THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING
      THE MEMOREX CD-R INTO EVIDENCE OVER MANNING'S CHAIN
      OF CUSTODY OBJECTION.
      Fourteenth Amendment to the U.S. Constitution.
V.    THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING A
      SUBSTANTIVELY UNREASONABLE SENTENCE ON MANNING
      Gall v. U.S., 128 S. Ct. 586 (2007)
      U.S. v. Dorvee, 616 F.3d 174 (2nd Cir. 2010)

Appellate Case: 13-1016    Page: 9    Date Filed: 03/27/2013 Entry ID: 4018910

<u>STATEMENT OF THE CASE</u>

On March 14, 2012, the Grand Jury returned an indictment charging Defendant-Appellant Michael Manning with one count of receipt of child pornography, a violation of 18 U.S.C. § 2252A(a)(2), "between on or about August 14, 2010 and on or about September 25, 2010," and specifically listing and describing two video files containing child pornography, one count of possession of child pornography on a "Western Digital hard drive," a violation of 18 U.S.C. § 2252A(a)(5)(B), "beginning at an exact time unknown, but including September 25, 2010," and specifically listing and describing one video file containing child pornography, and one count of possession of child pornography on a "Memorex compact disk," in violation of 18 U.S.C. § 2252A(a)(5)(B), "beginning at an exact time unknown, but including September 25, 2010," and specifically listing and describing two video files containing child pornography. Indictment p. 1-3.

On August 17, 2012, the government filed a "Motion to Dismiss Count II of the Indictment and to Amend Indictment by Interlineation." Document 44. That document dismissed the original Count 2, which charged Manning with receipt on his laptop, and amended Count 3 to Count 2. All further references to Counts 1 and 2 will be to the amended indictment. Jury selection in the case began on Tuesday, September 4, 2012; the jury trial commenced on the morning of

1

September 5.  On Friday, September 7, the jury returned a verdict of guilty on both counts.  Document 79.

On December 11, 2012, the district court rejected Manning's objections to the Presentence Investigation Report (PSI), adopted the PSI as its findings of fact and conclusions of law, and imposed a 360-month sentence.  Sentence Hearing TR., Vol. 2, p. 599.  Manning filed a timely Notice of Appeal on December 20, 2012.  *See* Document 106.

STATEMENT OF FACTS

In its case-in-chief, the government presented six witnesses: Officer Wayne Becker, Deputy Matthew Corbett, Detective Rebecca Biermann, Officer Cara Wood, Lieutenant Charles Subke, and Officer Steven Grimm.

Wayne Becker is an investigator with the Dent County Sheriff's Department, working in the Missouri Internet Crimes Against Children's Task Force.  Becker testified about peer-to-peer file sharing programs and networks, such as Gnutella or Limewire.  TR., Vol. 1, pp. 15-16.  Limewire can be downloaded by finding a link on the internet (through a Google search, for example), and then clicking on the link to execute the download file.  *Id*. at 17.  Once downloaded, the default storage location for the program is on the C: drive in Program Files.  *Id*. at 18.

Once opened, Limewire can show the user what files they were already sharing and allow the user to conduct a search for files.  *Id*. at 19-20.  The user may

2

right-click and select "Download" on the results from the search to download the file. *Id*. at 22. When the file begins to download, the progress is tracked on the screen, and the completion of the download is indicated to the user. The default directory location for downloaded files is under the user's ID in the Limewire folder. *Id*. at 20-21.

Next, Becker testified about IP addresses; "IP" stands for "Internet Protocol." *Id*. at 24. A computer is assigned an IP address typically by their internet service provider, and it allows traffic to be routed between computers on the internet. *Id*. In a home wireless internet set-up, the wireless router has a public-facing IP address. Becker also described SHA or hash values as a number created through an algorithm that identifies the "fingerprint" of a file. *Id*. at 26. The hash values are used by peer networking programs to identify files that are exactly the same. *Id*.

Becker testified that file-sharing networks are commonly used by people looking for child pornography because they are easy to access, anonymous, and have search functions to aid the search for files. *Id*. at 29. There are various keyword search terms that are common to child pornography, such as "PTHC" ("preteen hard core"), "R@gold," "7yo," "Lolita." *Id*. at 29-31. The Task Force uses automated software to generate searches using keywords, and then they log the IP addresses of the responses once they have examined the hash values to

3

confirm they match known child pornography files. *Id*. at 29-30. The IP addresses are then entered into a database where officers can further investigate if the IP address may be in their jurisdiction. *Id*. at 30. The database used by Becker is maintained by ICAC, Internet Crimes Against Children Task Force. *Id*. at 54.

On July 15, 2010, Becker looked up recently logged IP addresses on a law enforcement database and came across the IP address 67.210.177.23. *Id*. at 31-32, 46. In order for the IP address to display as open to sharing files, the computer would have to be turned on, and the program Limewire would have to be running. *Id*. at 33-34. This particular IP address came back with 22 file names, of which numerous were known by their hash values to be child pornography files. *Id*. at 34. The files offered were both .jpeg files, which are image files, and .mpeg or .mov, which are video files. *Id*. at 38.

Becker indicated that the files being offered for download from the IP address 67.210.177.23 had child pornography keywords in their titles. *Id*. Examples included "10-year-old," "Preteen," "kitty," "Underage PTHC," and "preteen raped." *Id*. at 38-39. The file titles also included more descriptive terms, such as "Cute little ten-year-old girl preteen boy posing naked nude sucking friend's penis young child sex." *Id*. at 39. No music files were offered for download. *Id*. at 40.

Appellate Case: 13-1016    Page: 13    Date Filed: 03/27/2013 Entry ID: 4018910

Becker selected three image files and one movie file to download from the targeted IP address. *Id*. at 41. The files were titled "4'2" cute gay preteen boys 10yo, 13yo snuggled together," "Preteen 10yo boy sticks willie up 9yo's bum," "Sex porn gay hairless kids little kid young pedo boys," and "PTHC 6yo boy joy bedtime rape until cum private pedo." *Id*. Then Becker effectuated the file download using a "single-source download" to ensure that the file was only being downloaded from the targeted IP address. *Id*. at 41-42. The image files were completely downloaded and the video file was 40% downloaded. *Id*. at 42, 48. Each of the image files depicted child pornography, as well as the portion of the video file downloaded. *Id*. at 46-48.

A subpoena was issued to the internet service provider of the IP address, Fidelity Communications, to request the subscriber information of the IP address at that particular date and time. *Id*. at 48. The subscriber information sent in response to the subpoena reflected that the customer's name was Michael Manning at 25 Sauk Court in Sullivan, MO. *Id*. at 49. The user information for Fidelity was user name "MEM659" and email address mem659@fidnet.com. *Id*. at 50. The registered customer's name was Michael E. Manning. *Id*. at 50-51. The account began at the registered service address listed above on July 13, 2010. *Id*. at 51. Because the address was in Franklin County, a county in which Becker does not normally work, he created a "peer-to-peer referral" containing a narrative of the

Appellate Case: 13-1016    Page: 14    Date Filed: 03/27/2013 Entry ID: 4018910

investigation, all files downloaded, and the subpoena response information. *Id*. at 51-52. It was forwarded to Lieutenant Charles Subke at Franklin County Sheriff's Office. *Id*. at 52. That concluded Becker's investigation into the matter. *Id*.

On cross-examination, Becker stated that IP addresses may be re-issued by internet service providers, and that the targeted IP address was only connected with Michael Manning for two days, since July 13. *Id*. at 55-56. Also, multiple computers could be using the same wireless router, yet the IP address would show as the same for each. *Id*. at 56. Based on Becker's investigation, he could only conclude that a computer using the router with the targeted IP address contained the child pornography; he was unable to say which computer or to whom it belonged. *Id*. at 56-57. Becker also testified that Limewire could be running on the computer without it being on the screen. *Id*. at 62-63. Finally, Becker stated that he could not conclude whether the computer offering files at the IP address was under control by remote access software. *Id*. at 67-68.

Matt Corbett is a detective with the Franklin County Sheriff's Department. *Id*. at 68. Corbett received word that a search warrant was to be executed at 25 Sauk Court on September 25, 2010. *Id*. at 69. During the execution of the search warrant on September 25, Corbett took seven photographs, admitted as Government's Exhibits 20(a) through (g). *Id*. at 70. Exhibit 20(b) depicted a laptop on a desk. *Id*. at 71-72. Corbett testified that Detective Biermann was

6

responsible for handling the computer as evidence, and performing a "soft shutdown." *Id*. at 72-73. The laptop computer was tagged as "Item A." *Id*. at 73. Corbett identified Exhibit 2 as the Dell laptop computer seized from 25 Sauk Court, listed as evidence Item A, and it contained the matching service tag depicted in Exhibit 20(g). *Id*. at 74-75.

Exhibit 20(f) is a picture of the desk area, where Biermann said she located two discs. *Id*. The discs, which were in plastic jewel cases, were collected as "Item B." *Id*. at 75. Though Corbett did not open the jewel cases, he recorded the brands of the discs as "Maxell" and "TDK." *Id*. at 75-76. Corbett identified these two discs at trial as Exhibit 6 (Maxell) and Exhibit 5 (TDK), and the envelope as Exhibit 3. *Id*. at 75, 76, 84. Corbett stated that after he sealed the discs in an envelope, he turned them in to the Evidence Custodian; Corbett believed that the discs were later sent to RCCEEG (Regional Computer Crime Education and Enforcement Group). *Id*. at 75-76. When the government moved for the admission of Exhibits 5 and 6, defense counsel objected on the grounds of insufficient foundation and chain of custody. *Id*. at 77-79. The objections were overruled and the evidence was admitted. *Id*. at 79.

On cross-examination, Corbett testified that Lieutenant Subke made contact with Manning during the execution of the search warrant, and that Manning was cooperative during the search. *Id*. at 86-87. He identified defense Exhibit A as a

7

close-up of the picture depicted in Exhibit 20(b), showing a CD-ROM on the left side of the desk, not in a jewel case. *Id*. at 90-91. Corbett explained that he did not look at that CD in detail. *Id*. at 92.

When asked to pick up Exhibits 5 and 6 at trial, Corbett pulled out three CDs in paper cases. *Id*. Corbett stated that he did not find the CDs in those cases, rather "I found them in the harder case." *Id*. When asked where he found the jewel cases, Corbett replied that he did not find them, and that he was in the other room. *Id*. Corbett confirmed that they were not found on the desk, because the pictures taken of the desk before the seizure began did not show the discs in jewel cases. *Id*. at 93.

The third CD was identified by its brand – Memorex. *Id*. Corbett did not find that CD; he testified that Detective Biermann found the CDs. *Id*. Detective Biermann told him the CDs were found in the desk. *Id*. at 94. Subsequently, Corbett learned there was nothing illegal on the Maxell or TDK CDs. *Id*. at 98. The CD which was located on the left side of the desk without a jewel case was not seized; Corbett concluded that it must not have been of evidentiary value because it was not seized, yet could not remember what the CD was. *Id*. at 100-101.

When he is searching for evidence of child pornography, Corbett typically opens the case of commercial DVDs to verify that they are, in fact, DVDs. *Id*. at 103-104. However, he could not recall if Manning had commercial DVDs during

8

the search, nor could Corbett recall whether he opened any commercial DVD cases to verify their contents. *Id*. at 108. Corbett testified that, because he could see through the jewel cases of Exhibits 5 and 6, he did not open the cases. *Id*. at 113. He admitted that "it was a mistake" to not open the jewel cases of Exhibits 5 and 6. *Id*. at 114.

After seizure of the computers and discs, the evidence remained in Corbett's locked office for three days, until September 28. *Id*. at 115-116. The evidence was then tagged and turned into Detective Ecklekamp, the Evidence Custodian. *Id*. at 114-115. Only those who work in the Detective Bureau have access to the locked offices where Corbett's office is located. *Id*. at 116. Corbett was unsure whether his own office door was locked. *Id*. at 117. He did not check the CD cases that were seized for fingerprints, nor did he check the CDs for fingerprints. *Id*. at 118-119.

Rebecca Biermann is a detective with the Franklin County Sheriff's Office. *Id*. at 122. She assisted with the search of 25 Sauk Court on September 25, 2012. *Id*. at 123. She performed a "soft shutdown" of the laptop on the desk, which is done by shutting down the computer from the Start menu, as opposed to unplugging it from the outlet. *Id*. at 126.

Biermann testified that she believed the CDs and hard covers were found in the second drawer of the desk. *Id*. at 127. She took them out of the drawer and put

9

them on top of the desk in order to photograph them.  *Id*.  Biermann did not open the jewel cases on September 25.  *Id*. at 128.  She identified Exhibits 5 and 6 as the discs she saw during the execution of the search warrant.  *Id*. at 129.  Biermann testified that she took the CDs from Franklin County Sheriff's Office to RCCEEG in Clayton, Missouri on October 14, 2010.  *Id*.  Upon arrival at RCCEEG, Biermann delivered the evidence to Cara Wood, who sits at the front desk and verifies the contents of the evidence with evidence sheet presented.  *Id*. at 130.  At this time, Wood brought to Biermann's attention that three CDs were present in the jewel cases, yet only two CDs were marked on the evidence sheet.  *Id*.

On cross-examination, Biermann admitted that she did not include in her report about the search the location of CDs when they were found.  *Id*. at 137.  She stated that, on the day of the trial, she had an independent recollection of where she found the CDs.  *Id*. at 137-138.  She also stated that if she came across commercial cases she would open them to verify their contents, but that she did not open the jewel cases when they were seized.  *Id*. at 138.

She stated that Detective Corbett seized the CDs in jewel cases, and that she did not ride back to the station with him.  *Id* at 143.  The protocol for securing evidence is to put the appropriate label on it, put an evidence type on it, and put it in a secure place, such as the evidence locker.  *Id*. at 145.  She stated that protocol

10

would allow for the storage of evidence in an office as long as it was secure. *Id*. at 146.

Cara Wood is an administrative assistant and update clerk at RCCEEG. *Id*. at 148. Her duties include reviewing and logging of evidence check-ins. *Id*. She identified Exhibit 2 as the laptop she received in evidence, noting the evidence number "10-265" written by her on the label. *Id*. at 149. When examining Exhibit 3 (the envelope) at login, she noticed that there were three CDs, instead of two, as marked by the evidence sheet. *Id*. at 150. Exhibit 6 (Maxell) and Exhibit 4 (Memorex) were in the same jewel, with the Memorex CD behind the Maxell CD; the TDK CD was in its own jewel case. *Id*. After notifying Biermann of the discrepancy, Wood noted "3" on the evidence sheet in reference to the number of CDs in the envelope, scratching out "2" in the process. *Id*. at 151.

On cross-examination, Wood testified that she received the evidence on October 14, 2010 in a sealed envelope. *Id*. at 152, 168. She identified the evidence sheet containing the alteration to "3" as Exhibit C, which was admitted into evidence. *Id*. at 153. Although Wood noted "3" on the evidence log, she did not record the correct brand of the third CD; the sheet did not reflect "Memorex" at all, instead it was altered to read "Maxell brand (2)." *Id*. at 159; *See* Defense Exhibit C.

11

Defense counsel attempted to have Wood identify Exhibit D, which was ultimately concluded to be a copy of an earlier version of Exhibit C. *Id*. at 160-161. She did not know where Exhibit D came from, because it does not have her signature as the person logging the evidence into RCCEEG. *Id*. at 162-163. Exhibit D reflected the same information as Exhibit C with regard to the top portion of the sheet, where the evidence is detailed, except that it stated "two" CDs. *Id*. at 165. So, Exhibit D is a copy of the evidence sheet before Wood made the change. *Id*. Wood also pointed out that the signatures at the bottom of Exhibit D were different from those on Exhibit C, indicating that, although at one time Exhibit D may have been a photocopy of an earlier version of Exhibit C, other people had signed it since its creation. *Id*. at 166.

Charles Subke is a Lieutenant with Franklin County Sheriff's Office. *Id*. at 169. On July 30, 2010, Subke was notified of a case transfer from Officer Becker in Dent County. *Id*. at 170. Subke drove by the house at 25 Sauk Court, and ran the license plates of the car parked in the driveway, which came back registered to Michael Manning. *Id*. at 172. Subke completed an Application and Affidavit in Support of a Search Warrant on September 21, 2010. *Id*. Subke positively identified Michael Manning in the courtroom at trial. *Id*. at 174.

Manning was cooperative during the search, and was told by Subke that he was not under arrest, that he did not have to make any statements, and that he

12

could stop answering questions at any time. *Id*. at 175. When asked if he knew why Subke was there, Manning replied that he did not. *Id*. at 176. Manning stated that he did own a computer, which he obtained around May 2010. *Id*. Manning also stated that his internet service provider was Fidelity Internet. *Id*. He also indicated that his wireless internet is password protected. *Id*.

During the informal interview Manning stated that he had file sharing programs since May 2010, that he had been offered a free Gigatribe use but did not use it, that he did have Gigatribe on his computer, that his operating system was Windows Vista, his log-in name was MEM659, and provided Subke with the password protecting the computer. *Id*. at 177-178. When asked how he used Limewire, Manning responded by saying he used it to download music. *Id*. at 178.

Manning stated that he did not know anything about the child pornography about which he was being questioned. *Id*. He did state that there would likely be adult pornography on the computer, but denied any knowledge of child pornography. *Id*. Manning stated that his friends have access to his computer at times, and that they might be responsible for his IP address showing child pornography as present. *Id*. at 179. He named three people: Kenny Green, Jr., John Barnett, and Joseph Butler. *Id*. Manning stated in response to a question that he is a "strong intermediate" level computer user. *Id*. at 181.

13

On cross-examination, Subke identified Exhibit D as a copy of the official, formal evidence log in the case, showing two CDs: a TKD (sic) and a Maxell. *Id*. at 183, 185. Exhibit D was admitted without objection. *Id*. at 185. The first signature on the Exhibit D evidence log was Detective Corbett on September 25, 2010. *Id*. at 186. Three days later he gave it to Maxine Ecklekamp, the evidence custodian, as demonstrated by the signatures and their dates. *Id*. Next, it shows the evidence going to Detective Biermann on October 14. *Id*. at 186-187. However, following that entry, the log shows Maxine Ecklekamp in possession of Item A – the laptop. *Id*. at 187-188. Subke admitted that the evidence sheet appears to be missing information, including how and when Item A got from Biermann to Ecklekamp. *Id*. at 188. Subke conceded that there was a break in the chain of custody from October 14, 2010 to January 3, 2011. *Id*. at 188-189.

The entry on January 4, 2011 showing a transfer of evidence from Biermann back to Ecklekamp does not indicate in the "item" column the evidence item being transferred. *Id*. at 191. Subke admitted that it is not possible to say what evidence was transferred between Biermann and Ecklekamp on January 4, 2011. *Id*. Subke stated that the evidence sheet identified as Exhibit C was more accurate because it was more complete. *Id*. at 195.

Subke further testified that there were two separate evidence sheets containing separate transfers of the evidence. *Id*. at 196. According to Exhibit C,

Appellate Case: 13-1016     Page: 23     Date Filed: 03/27/2013 Entry ID: 4018910

Subke was unable to say where the evidence was from October 14, 2010 to April 7, 2011. *Id*. at 198. Subke stated that the evidence sheets never recorded a "Memorex" CD as being logged into evidence; however the evidence sheet was changed to reflect two "Maxell's." *Id*. at 199. Subke also testified that he did not know who made the changes to the evidence sheet, which he admitted goes toward the integrity of the evidence. *Id*. at 200.

Subke admitted that he was unsure what computer was used for child pornography at 25 Sauk Court, only that a computer with an IP address at that location was used. *Id*. at 211. He did not ask Manning's spouse, Sara Manning, with whom he was going through a contentious divorce, whether she knew the password to his computer or wireless internet. *Id*. at 212.

Following the conclusion of Subke's testimony, the government moved for the admission of Exhibit 4, the Memorex CD-R. *Id*. at 220. Defense counsel objected on the grounds of insufficient foundation and chain of custody issues. *Id*. Exhibit 4 was admitted over defense counsel's objection. *Id*. at 222.

Steven Grimm was the government's final witness. He is a computer forensic examiner at RCCEEG; he is also a police officer and detective at Webster Groves Police Department. *Id*. at 222. Grimm identified government's Exhibit 3 as the envelope that contains three optical discs, including government's Exhibit 4, a Memorex brand CD-R. *Id*. at 228-229. Government admitted Exhibit 22

15

through Detective Grimm, the Declaration of Michael L. Morin, Director of Legal Affairs at Imation Corp. *Id*. at 229. Exhibit 22 stated that Imation Corp. has never manufactured Memorex brand CD-ROM discs in the state of Missouri. *Id*. at 230.

Grimm noted that at the beginning of his investigation of Exhibit 4, he noticed some damage to the CD-R. *Id*. He used software to take a digital image of the disc, which takes an exact copy of the disc, to be used for examination. *Id*. at 230-231. Hash values are created to compare between the discs, and the digital image produces a hash value that exactly duplicates the hash value of the original CD-R. *Id*. The digital image he examined in this case had a hash value that perfectly matched the hash value of Exhibit 4. *Id*. at 232.

For his investigation, Grimm used the exact digital image of Exhibit 4, rather than the actual Exhibit 4 Memorex CD-R, which was returned to evidentiary storage. *Id*. at 233. During his investigation of Exhibit 4, Grimm bookmarked 14 video files that depicted child pornography. *Id*. He testified that he recognized the depictions as child pornography based on his experience investigating child pornography, as well as the fact that he is a father of two children. *Id*. at 236. Portions of three videos were played from Exhibit 4 (admitted as Exhibits 24, 25, and 26), each containing prepubescent minors engaged in sexually explicit activity. *Id*. at 237-241.

Appellate Case: 13-1016    Page: 25    Date Filed: 03/27/2013 Entry ID: 4018910

Exhibits 27(a)-(d) were admitted through Detective Grimm. *Id*. at 243. He identified Exhibit 27(d) as a photo of the hard drive removed during the investigation. *Id*. at 244. The location of manufacture was depicted: "Product of Thailand." *Id*. at 245. The physical hard drive, Exhibit 1, was also admitted. *Id*. at 246. He investigated the hard drive by attaching it to a program that prevents data from being written to the hard drive, then creating a perfect forensic image, the optical disc. *Id*. at 246-247. The hash values were compared between the hard drive and the optical disc to ensure a perfect match. *Id*. at 247-248.

The software used to create a database of the hard drive files was Access Data's Forensic Tool Kit. *Id*. at 248. The government admitted Exhibit 29, which Grimm noted was a power point slide picture of the registry information, noting Microsoft Windows Vista was installed on November 19, 2009, and the registered owner was "MEM659." *Id*. at 250. The login count, found in the registry of the computer, noted that the last login was September 25, 2010. *Id*. at 252.

The program Limewire was found to have been installed on July 8, 2010. *Id*. at 254-255. Yahoo Messenger was downloaded on August 3, 2010. *Id*. at 256. Government admitted Exhibit 23, which contained Exhibits 24-50 over defense counsel's objection to the prejudicial and cumulative nature of the slides. TR., Vol. II, p. 277. Exhibit 33 showed that the program Gigatribe had been installed as a usable application on the computer. *Id*. at 278-279.

17

Gigatribe is a program that allows users to chat with each other and select which folders can be viewed and accessed for download by the other user, all while remaining anonymous. *Id*. at 279-280. The program can be found on the internet, downloaded, and the user will enter a name, in this case "boost_virgin." *Id*. at 283-283. The default location for downloaded files was: "C:/users/MEM659/documents/gigatribedownloads/boost_virgin." *Id*. at 281. The "MEM659" identifies the computer user with which the location is associated. *Id*. The sub-folder created in the documents folder is "gigatribedownloads," and "boost_virgin" identifies the Gigatribe user whose files are downloaded. *Id*. at 282. Grimm found images and video files depicting child pornography when he investigated the folder. *Id*. at 285. Based on their location within the computer, Grimm concluded that the files had been downloaded through the Gigatribe program, using the internet. *Id*. at 286.

Grimm testified that 1,029 images depicting child pornography were found on the computer hard drive, and 149 video files depicting child pornography were found. *Id*. at 287, 292. The government then presented as evidence six image files and portions of eight video files found on the hard drive, all depicting child pornography. *Id*. at 288-304. The files were "likely" created between August 14, 2010 and September 11, 2010. *Id*. at 288-302.

Appellate Case: 13-1016     Page: 27     Date Filed: 03/27/2013 Entry ID: 4018910

By viewing the registry associated with Windows Media Player, Grimm was able to see the file names of the nine most recent videos that had been played using the program, two of which had file names suggestive of child pornography. *Id*. at 300. The suggestive terms included "3yr old," "video boy and dad," and "boy and man brother love." *Id*. at 301.

Government moved for admission of Exhibits 52(a)-(p), Gigatribe chats between various users and boost_virgin. *Id*. at 309. Defense counsel objected that the chats contained hearsay, both by boost_virgin and the other users. *Id*. at 310-318. Defense counsel also objected on the grounds of the Sixth Amendment, arguing that there is "no ability to cross-examine these people." *Id*. at 310. Government initially asserted that the statements were not offered for their truth, and then argued that the statements by boost_virgin were statements of a party-opponent. *Id*. at 311-312. The government also argued that the chats were being offered to show the defendant's knowledge, intent and absence of mistake based on the fact that they were found on his computer. *Id*. at 311-312. The Court overruled defense counsel's objections, stating:

> "I don't believe that this is hearsay. Well, I don't think it is hearsay. I think that this evidence tends to establish the identification of the defendant as boost_virgin and as somebody who has knowledge of child pornography and who has viewed child pornography." *Id*. at 317.

Exhibits 52(a)-(p) were admitted. The government also moved for the admission of Exhibits 53(a)-(d), Yahoo Messenger chats from various users and MEM659. *Id*. at 318. Defense counsel made the same objections as were made to Exhibits 52(a)-(p), and the Court overruled them, admitting Exhibits 53(a)-(d) into evidence. *Id*. at 318, 362. Grimm testified that most of the exhibits that were shown at trial depicting child pornography were found in the Gigatribe downloads folder. *Id*. at 349.

Grimm identified Exhibits 52(a)-(p) as a chat history between boost_virgin and other users. *Id*. at 319. The chat transcript between boost_virgin and 14 other users was read by Grimm, pausing in between each chat to have Grimm offer his opinion on what the communications by each user meant. *Id*. at 320-369. Detective Grimm offered conclusions regarding Gigatribe chats that can be categorized as follows:

- Trading material, exchanging files, and accessing files – TR. Vol. II, pp. 322-325, 347, 357;

- Vetting interests and ensuring the other user is not law enforcement – TR. Vol. II, pp. 329-333, 336, 340, 353; and

- Organization of files in libraries and discussions of content – TR. Vol. II, pp. 338-339, 342-343, 349-350.

Appellate Case: 13-1016     Page: 29     Date Filed: 03/27/2013 Entry ID: 4018910

Grimm testified that Yahoo Messenger is a chat program that also was found installed on the defendant's computer. *Id*. at 360. He was able to recover a chat history from the computer using a program called Internet Evidence Finder by Gadsoft. *Id*. at 361. The local user name associated with the chat history was identified as "MEM659." *Id*. at 362. The government read through the chats between MEM659 and various users on Yahoo Messenger, with Grimm offering opinions as to the meaning of the chat testimony. *Id*. at 364-373. The opinions offered by Grimm can be categorized as follows:

- Exchanging "stats" or identifying information – TR. Vol. II, pp. 364, 371;

- Preferences of child pornography – TR. Vol. II, pp. 367-373; and

- Finding, trading and storing files – TR. Vol. II, pp. 367-370.

The Court accepted into evidence Government's Exhibit 51, an Explorer History with information showing dates and times accessing files containing names indicative of child pornography. *Id*. at 375-376. The dates and times showing the "Last Visited Time" occurred in August and September 2010. *Id*. at 377. Numerous files included terms indicative of child pornography. *Id*. at 379. The names of the files including the

21

suggestive keywords would have been visible to the user of the computer downloading and accessing the files. *Id.* at 379-380.

The direct examination of Grimm continued with the admission into evidence of Exhibit 54, a report prepared by Detective Grimm detailing the activity of the Manning's computer and hard drive with dates, times, and suspected child pornography activity. *Id.* at 381-382. The dates included:

- May 7, 2010;

- July 15, 18, 27, 28, and 30, 2010;

- August 3-5, 13-15, 17, 22, 24, 25, and August 29, 2010; and

- September 11 and 18, 2010. *Id.* at 381-390.

On cross examination, Grimm testified that he took possession of the laptop from the evidence storage locker on July 23, 2012. *Id.* at 400. Prior to that date, Grimm was unable to say where the laptop and CDs were located. *Id.* at 405-406. Government's Exhibit 4, the Memorex CD-R, was created on August 20, 2008 and Western Digital hard drive was made on March 20, 2009; therefore, Grimm was able to conclusively state that the laptop that was seized and investigated by Grimm was not used to create the Memorex CD-R. *Id.* at 411-412.

Grimm conceded that his testimony did not reflect that he believed the defendant was responsible for the child pornography on the evidence he

Appellate Case: 13-1016   Page: 31   Date Filed: 03/27/2013 Entry ID: 4018910

examined. *Id*. at 412-413. He admitted that any person reasonably familiar with the defendant could have exchanged the identifying information contained within the chats. *Id*. at 413.

Detective Biermann examined the laptop in October 2010, prior to Grimm's investigation in July 2012. *Id*. at 423. During her analysis, Detective Biermann did not locate any chat history evidence, either of Gigatribe or Yahoo Messenger chats. *Id*. at 424. Defense counsel then attempted to examine Detective Grimm regarding a possible discrepancy between the numbers of pornographic videos found on the Memorex CD in his investigation versus Detective Biermann's. *Id*. at 427-429. Government objected that it was improper impeachment and irrelevant because Grimm did not review Biermann's report before he conducted his analysis. *Id*. at 427-429. The Court sustained the government's objection, explaining that defense counsel could only ask Grimm about his own analysis. *Id*. at 433.

Grimm admitted that the jewel case containing the Memorex CD-R was not fingerprinted, nor was the Memorex CD-R. *Id*. at 438-439. He testified that it "could have" mattered if the jewel case and CD-R had fingerprints of someone other than the defendant. *Id*. at 439. Furthermore, the Memorex CD-R did not contain any identifying images of the defendant or his family. *Id*. at 436.

23

Computer programs exist that allow a person to control a computer when they are not physically in front of the computer; Grimm termed these "remote access" software. *Id*. at 444-445. In addition to commercially available remote access software, malicious remote access software exists that would allow a computer to be remotely controlled for malicious purposes. *Id*. at 445-446. Some of these programs are designed to avoid detection. *Id*. at 446. During his investigation, Grimm did not look extensively for remote access software on the laptop. *Id*. at 447. Grimm could not say whether the chats and child pornography files were placed on the laptop using remote access software. *Id*. at 449.

Following the conclusion of Grimm's testimony, the government read into evidence a stipulation that the "visual depictions that are alleged to have been received and possessed in the indictment are of actual minors." *Id*. at 470. After reading the stipulation, the government rested. *Id*.

The defendant, Michael Manning ("Manning"), was the only witness for the defense. At the time of trial, he was still married to Sara Manning, although he was in the middle of a divorce. *Id*. at 472-473. Manning testified that the desk at which his laptop was found during the seizure was owned by both he and Sara throughout their marriage. *Id*. at 474. Sara

24

primarily used the desk while they lived together, though it remained at the house at 25 Sauk Court in Sullivan, Missouri. *Id*. at 474.

Manning met Jim Traxler through Cub Scouts around September of 2006. *Id*. at 476. Manning learned over the course of their friendship that Traxler had spent 20 years in government intelligence. *Id*. at 477. Around the time that Manning and Sara moved into the 25 Sauk Court house, Manning noticed that Sara was spending a lot of time with Traxler. *Id*. at 478. Sara and Traxler traveled out of town together on at least one occasion. *Id*. at 479. Manning filed for divorce in the fall of 2009. *Id*. at 280. At that time, Manning moved in with his brother in Gerald, Missouri. *Id*.

After losing his job as a process engineer, Manning purchased the laptop computer (Government's Exhibit 2) on eBay in April of 2010. *Id*. at 481. He personally set up the user name and password for the laptop; the user name was "MEM659" and the password was "ESCO2659." *Id*. at 482. This was the same user name and password that was used on the computer when Manning, Sara, and their two children still lived together. *Id*. at 483. Manning and Sara used the password throughout their marriage as a "security word" for things like credit cards and telephone bills. *Id*. at 484.

Manning moved back into the house at 25 Sauk Court in May of 2010. *Id*. Every piece of furniture had been moved out of the house by Sara except

Appellate Case: 13-1016    Page: 34    Date Filed: 03/27/2013 Entry ID: 4018910

for the desk. *Id.* Manning never went through the contents of the drawers; he testified that he did not know what was in the drawers. *Id.* at 485. Manning suspected Sara had accessed the house without his permission to take items on May 7, 2011; two weeks later, on May 19, Manning returned home to find more items missing. *Id.* at 485-489.

Manning denied that he was responsible for the communications in the chats on Gigatribe and Yahoo Messenger. *Id.* at 495. He did not look at child pornography, and stated that it was "gut-wrenching" to watch it in the courtroom. *Id.* at 495-496. He did not put the child pornography on the computer, and he did not know it was present on the computer. *Id.* at 496.

On cross-examination, Manning testified that the password for his wireless network was the same as for his computer. *Id.* at 498. Although he was going through a contentious divorce, he did not think to change his password. *Id.* at 499. Nor did he change his password after he suspected Sara broke into his house. *Id.* Once he moved back into the house, he never opened the desk drawers; he mainly used the top of the desk. *Id.* at 503.

Following the testimony of Michael Manning, the defense rested. *Id.* at 534.

On September 7, 2012, the jury returned a unanimous verdict of guilty on Count I – Receipt and Count II – Possession. *Id.* at 546-547. The jury

Appellate Case: 13-1016    Page: 35    Date Filed: 03/27/2013 Entry ID: 4018910

unanimously found that the defendant received 14 files, including both files charged in the amended indictment; the defendant was unanimously found to have possessed three files, including both files charged in the amended indictment. *Id*. at 547-548. The jury was polled and each juror responded that the guilty verdict on both counts was their true and correct verdict. *Id*. at 548-549. Judge Jackson then entered judgment in accordance with the verdict. *Id*. at 549.

The Presentence Investigation Report (PSI) used United States Sentencing Guidelines § 2G2.2 to compute Manning's base offense level. Presentence Investigation Report at 6. Pursuant to the grouping rules of USSG § 3D1.2(d), counts one and two were grouped into a single group. *Id*. His base offense level was 22, under USSG § 2G2.2(a)(2), for the receipt of child pornography. *Id*. The following specific offense characteristics were found in this case:

- The material in the offense involved a prepubescent minor or a minor who had not attained the age of twelve year – two level increase under USSG § 2G2.2(b)(2);

- The offense involved distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain – five level increase under USSG § 2G2.2(b)(3)(B);

27

- The offense involved material that portrays sadistic or masochistic conduct or other depictions of violence – four level increase under USSG § 2G2.2(b)(4);

- As the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor – five level increase under USSG § 2G2.2(b)(5);

- The offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt or distribution of the material or for accessing with intent to view the material – two level increase under USSG § 2.G2.2(b)(6); and

- The offense involved more than 600 images – five level increase under USSG § 2.G2.2(b)(7)(D). *Id*. at 6-7.

An adjustment for obstruction of justice was also added, increasing the total offense level by two more points. *Id*. at 7. Pursuant to Chapter 5, Part A (comment n.2), where the total offense level is calculated in excess of 43, the offense level will be treated as 43. *Id*. Here, the initial total offense level was calculated as 47; it was reduced to 43. *Id*.

The minimum term of Count I is five years and the maximum term is 20 years. 18 U.S.C. § 2252A(a)(2) and 18 U.S.C. § 2252A(b)(1). The maximum term of imprisonment on Count II is 10 years. 18 U.S.C. §

28

2252A(a)(5)(B) and 18 U.S.C. § 2252A(b)(2). The total offense level, combined with Manning's criminal history in Category I, produced a guideline range of life. PSI at 13. Because the maximum of the guideline range exceeded the statutorily authorized maximum sentence of 240 months, the PSI recommended a consecutive sentence on at least one count to achieve the total punishment. *Id*. at 13-14.

Manning objected to several aspects of the PSI. Document 87. First, he objected to the characterization that three CD-Rs were seized. *Id*.; PSI at 4. Second, he objected to the chat evidence, arguing that he was not the individual typing the chats. Document 87 at 2. Third, he challenged the assertions that he sexually abused his children. *Id*. He also objected to the obstruction of justice enhancement. *Id*. Manning challenged the enhancement for distribution or receipt or expectation of receipt of a thing of value. *Id*. Manning objected to the enhancement for a pattern of activity involving the sexual abuse or exploitation of a minor, arguing that he was not involved. *Id*. Finally, Manning objected to the sentencing guideline calculation based on the foregoing objections. *Id*.

At the December 11, 2012 sentencing hearing, the government presented the testimony of a forensic interviewer, Pamela Musgrave. *Id*. at 555. Musgrave testified that she interviewed Manning's two sons on April 21, 2011 and that both

Appellate Case: 13-1016    Page: 38    Date Filed: 03/27/2013 Entry ID: 4018910

of them denied any type of abuse by Manning. *Id*. at 558. Musgrave went on to state that she re-interviewed Manning's son Josh on May 3, 2011, and that Josh then claimed that he had been sexually abused by Manning. *Id*. at 559. The court then allowed the Government to play a DVD recording of Musgrave's interview of Josh Manning over Manning's objection. *Id*. at 561. The district court overruled all of Manning's objections that had any impact on the sentencing guideline application and sentenced him to 240 months on Count 1 and a consecutive 120 months on Count 2 for a total of 360 months. Manning filed a timely notice of appeal on December 20, 2012, and this appeal followed.

Appellate Case: 13-1016    Page: 39    Date Filed: 03/27/2013 Entry ID: 4018910

## SUMMARY OF ARGUMENT

The evidence was insufficient to convict Manning on either count 1 for receipt or count 2 for possession of child pornography. The conviction for both receipt and possession of child pornography constitutes double jeopardy. The district court abused its discretion in admitting the chat transcripts over Manning's hearsay objection. The district court abused its discretion in admitting the Memorex CD-R over Manning's chain of custody objection. The district court abused its discretion in sentencing Manning to 360 months, a substantively unreasonable sentence.

31

## STANDARDS OF REVIEW

The Court of Appeals reviews a challenge to the sufficiency of the evidence de novo, viewing the evidence in light most favorable to the verdict, resolving conflicts in favor of the verdict, and accepting all reasonable inferences that support the verdict. *U.S. v. Yarrington*, 634 F.3d 440, 449 (8th Cir. 2011).

The Court of Appeals, in the absence of the argument at the lower level, reviews a claim of violation of double jeopardy for plain error. *U.S. v. Muhlenbruch*, 634 F.3d 987, 1002 (8th Cir. 2011). To establish plain error, Manning must show: (1) an error; (2) that is plain; and (3) that affects substantial rights. *Id.*

The Court of Appeals reviews challenges to evidentiary rulings under an abuse of discretion standard and "will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when [the court] believe[s] that the error has had more than a slight influence on the verdict." *Yarrington*, 634 F.3d at 447.

The Court of Appeals reviews district court's sentence for reasonableness under an abuse of discretion standard by first ensuring that the district court committed no significant procedural error and then reviewing the substantive reasonableness of the sentence. *U.S. v. Gall*, 522 U.S. 38, 50-51 (2007).

Appellate Case: 13-1016    Page: 41    Date Filed: 03/27/2013 Entry ID: 4018910

<u>ARGUMENT</u>

I. THE EVIDENCE WAS INSUFFICIENT TO CONVICT MANNING OF RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY BEYOND A REASONABLE DOUBT.

**A.    Introduction**

The government did not put forth sufficient evidence to prove beyond a reasonable doubt that Manning *knowingly* received and possessed child pornography.  Although the government went to great lengths to prove that child pornography was present on the laptop, the government put forth insufficient evidence to prove beyond a reasonable doubt that Manning was the user who downloaded or knowingly received the child pornography found on the hard drive. Furthermore, the government did not introduce sufficient evidence for a jury to conclude beyond a reasonable doubt that Manning knowingly possessed the Memorex CD-R.

**B.    Receipt of Child Pornography on the Hard Drive**

The government charged Manning with receipt of child pornography via a Western Digital Hard Drive, admitted as Exhibit 1 during the trial.  *See* Document 1.  In order to prove receipt of child pornography, the government had to prove beyond a reasonable doubt that Manning "… knowingly received child pornography that had been mailed, shipped and transported in interstate and foreign commerce by any means, including by computer…"  18 U.S.C.

33

2252A(a)(2).  In order to prove that Manning knowingly received child pornography, the government introduced the testimony of three witnesses: Wayne Becker, Charles Subke, and Steven Grimm.  The government's other three witnesses, Matt Corbett, Rebecca Biermann, and Cara Wood, testified primarily about the CD-Rs seized.

Although Officer Becker testified that the laptop at the targeted IP address at Manning's house was offering child pornography for download via Limewire, he could not offer an opinion as to the user of the computer at the time the files were being offered.  TR. Vol. I, pp. 31-32, 49, 56-57.  He found that a computer at the targeted IP address was offering child pornography, but no testimony was offered to suggest Becker could identify the user offering files for download.  Becker also testified that it was possible for the Limewire application to be open, running, and offering files for download without the Limewire window being open on the screen.  *Id*. at 62-63.  Finally, Becker could not say whether the computer offering child pornography for download at the targeted IP address was under the influence of remote control software.  *Id*. at 67-68.

Subke testified to his conversation with Manning during the search and seizure on September 25, 2010.  He stated that Manning admitted that he owned the computer, which he purchased online around May 2010.  *Id*. at 176.  Manning stated that he used Limewire to download music, that he denied using Gigatribe

34

despite being offered a free trial, that his login name was MEM659, and that he had a password protecting the computer, which he gave to Subke. *Id*. at 177-178. Manning told Subke that he did not know anything about child pornography on the computer, and that three of his friends had access to his computer. *Id*. at 178-179. On cross-examination, Subke admitted that he did not know which computer at the IP address at 25 Sauk Court was used for child pornography, nor did he ask Sara Manning whether she knew the password to Manning's computer. *Id*. at 211-212.

The government offered testimony from Detective Grimm regarding the contents of the hard drive and laptop. Grimm noted that the hard drive was manufactured in Thailand. *Id*. at 245. Limewire, Yahoo Messenger, and Gigatribe were found to be downloaded on the computer. *Id*. at 254-256, 278-279. Although Grimm noted the default location for files in the MEM659 folder, he did not offer any testimony that the Gigatribe program was downloaded while Manning possessed the computer. *Id*. at 281. The files depicting child pornography were "likely" created between August 14 and September 11, 2010, though Grimm admitted he could not conclude that it was Manning who in fact downloaded the files. *Id*. at 288-302, 412-413.

Gigatribe chat transcripts were used to attempt to identify the Gigatribe user "boost_virgin" as Manning. Grimm specifically noted certain chats describing boost_virgin as "Mike," "from MO," the physical characteristics of Manning, and

35

the ages of his children. *Id*. at 362-365. However, Grimm conceded that any person reasonably familiar with Manning could have exchanged the identifying information within the chats. *Id*. at 413. Grimm also offered substantial testimony that showed the times of activity on the computer regarding child pornography files, but Grimm could offer no testimony as to the user of the computer at those times. *Id*. at 381-390, 412-413.

Finally, Grimm testified about the existence of remote access software. *Id*. at 444-445. Malicious remote access software is available which allows a person to remotely control another person's computer for malicious purposes; and these programs are often designed to avoid detection. *Id*. at 445-446. Grimm did not look extensively for remote access software on the laptop, nor could he say whether remote access software was used to place the child pornography files on the laptop. *Id*. at 447, 449.

The evidence reviewed, *supra*, does not prove beyond a reasonable doubt that Manning knowingly received child pornography. Officer Becker's testimony was that a computer at the targeted IP address was offering child pornography for download via Limewire. However, no evidence of child pornography was found in Limewire folders on Manning's computer; all of the alleged child pornography found was in the Gigatribe download folders, or other unnamed folders. Furthermore, not only could Becker not identify a specific computer offering the

36

files for download, he could not speculate as to the identity of the user offering the files. Thus, although Becker established that child pornography was offered by a computer at Manning's address, he could not conclude whose computer it may have been, nor who may have been using the computer offering the child pornography files.

Subke's testimony added little of value to advance the proposition that Manning knowingly received child pornography. He explained that Manning admitted owning the laptop which was seized, that he stated having Limewire on the computer to download music, and that his friends had access to his computer. As noted, no child pornography files were found in the Limewire folders; however, numerous downloaded music files were found in the folders, consistent with Manning's statement regarding his use of Limewire. Subke did not ask Manning where he was on July 15, 2010, the date when Becker discovered a computer at Manning's address offering child pornography for download. Subke also did not investigate whether Sara Manning still had access to the house and the laptop.

Grimm offered extensive testimony about the presence of child pornography on Manning's laptop. However, this point was hardly disputed at trial. Grimm could not offer an opinion as to who was using the computer when the child pornography was placed on the computer. The attempt to identify Manning as boost_virgin, and thus responsible for the downloads of child pornography via

37

Gigatribe, were insufficient to prove boost_virgin's identity beyond a reasonable doubt. As Grimm conceded, any person reasonably familiar with Manning, especially his estranged wife, could offer the identifying information that was found in the chats.

Importantly, as several witnesses testified, Manning's home used wireless internet, protected by a common password he used throughout his marriage to Sara Manning, known by Sara Manning, and which remained unchanged after their separation. Furthermore, the government's computer experts both admitted to the existence of remote access software, which would allow a person to remotely control another person's laptop. Taken altogether, the evidence reasonably suggests the possibility of a person downloading child pornography onto Manning's computer without his knowledge.

The opportunity to do so existed – any computer could contain remote access software allowing it to control Manning's computer, or any person could log onto Manning's wireless network with his common password and download child pornography using his IP, or remotely accessing his computer. Furthermore, despite having no burden to do so, Manning offered testimony that he was going through a contentious divorce with Sara Manning, she knew his password for the computer and the wireless internet, and he suspected her of entering his house without his knowledge.

38

The government's evidence, which primarily addressed of the presence of child pornography on the laptop, did not sufficiently eliminate the real possibility that someone else was responsible for the placement of child pornography on the laptop. The receipt charge requires proof that Manning was the user on the computer *at the time* the files were placed on it – evidence that the government did not offer.

Contrast with *U.S. v. Starr*, where the court emphasized other reliable evidence in upholding convictions for receipt of child pornography. 533 F.3d 985, 999 (8th Cir. 2008). Starr chatted online using the name "darklordmaster11" and spoke on the phone with several underage girls, enticing two of them to send him sexually explicit photographs. *Id*. at 990-991, 999. He argued there was insufficient evidence that he personally received child pornography because he used a pseudonym when chatting over the internet and his wife had access to his email accounts. *Id*. at 998. The court upheld the convictions emphasizing that Starr previously admitted to owning the name "darklordmaster11" and explicit photographs of one of the girls with whom he spoke. *Id*. The court also rejected his argument that others had access to his computer specifically noting that, according to phone records and testimony of the underage girl, he had sexually explicit telephone conversations with the same girl, of whom he also had explicit pictures. *Id*.

39

The *Starr* case and this case are similar in that online conversations took place using a pseudonym. However, that is where the similarities end. In *Starr*, Starr admitted to owning the screen name and photographs; here, Manning did not admit to owning the name boost_virgin or MEM659, nor any photographs, and challenged those notions as a central part of the defense strategy. Starr used live conversations on the phone to facilitate receipt of child pornography; phone records and testimony by the underage girl on the phone that Starr requested the photographs were key to proof of receipt. Such evidence conclusively showed that Starr was the person who engaged in the receipt of child pornography. The only supposed identifying factors here were general physical characteristics, those that any person familiar with Manning could have offered, unlike the live conversations on the phone. Here, no extrinsic evidence was put forth to establish Manning's presence at his computer at the time when it was demonstrated to have received child pornography. Instead, the government sought to have the jury draw the inference that it was Manning engaged in the chats. Such basic and superficial circumstantial evidence was insufficient to prove Manning was guilty of receipt beyond a reasonable doubt.

## C.    Possession of Child Pornography on Memorex CD-R

The government charged Manning with possession of child pornography based on a Memorex CD-R that was allegedly found in Manning's home. *See*

40

Document 1.  The Memorex CD-R was admitted as Exhibit 4, over Manning's objection.  In order to prove possession, the government had to prove beyond a reasonable doubt that Manning "knowingly possessed, or knowingly accessed with intent to view, any . . . computer disk, or any other material that contains an image of child pornography" that has been transported in interstate commerce or produced using materials that have been transported in interstate commerce "by any means, including by computer."  18 U.S.C. § 2252A(a)(5)(B).

It can fairly be said that the only evidence purportedly tying Manning to the Memorex CD-R is that it was allegedly found in a desk he was using.  Other than its location at the alleged time of seizure, no evidence was offered by the government to prove that the CD-R was knowingly possessed by Manning.  On the other hand, extensive evidence was offered to rebut the proposition that the CD-R belonged to Manning.

Grimm admitted that the files on the CD-R were created on August 20, 2008, when Manning was still living with his wife and they were sharing the desk, though it was primarily used by Sara Manning, in which the CD-R was supposedly found.  When Manning moved back into the house after his separation from his wife, the only furniture remaining was the desk, and he did not ever check the contents of the desk upon returning to the house; as he stated, he only used the top of the desk.  The government offered no evidence that Manning owned a computer

41

at the time the CD-R was created; he did not purchase the laptop that was seized until seventeen months later.

No identifying information was found on the contents of the disc: no author was logged, no photos of Manning or his family, and no folders with names resembling those found on Manning's laptop. No handwriting was found on the CD-R or the jewel case. Astoundingly, no fingerprints were taken of the CD-R, nor were any taken of the case in which it was supposedly found. Grimm conceded that it could have been important had someone else's fingerprints been found on the CD-R. In short, the only link between Manning and the CD-R was that it was allegedly found in a desk owned and shared by Manning and his estranged wife, who was the primary user of the desk, in a house owned and previously shared by Manning and his estranged wife, used by Manning only after Sara Manning left it as the only furniture when she moved out. This is hardly proof beyond a reasonable doubt that Manning knowingly possessed the CD-R.

Contrast this case with *U.S. v. Koch*, where a conviction for possession of child pornography on a computer and flash drive was upheld based on particular identifying information. 625 F.3d 470, 478-479 (8th Cir. 2010). Koch challenged that there was sufficient proof that he knowingly possessed the computer and flash drive that contained child pornography. *Id*. at 478. The court pointed out that the user names on both devices were variations on Koch's first name. *Id*. The court

42

also noted that both contained pornographic images in folders that had to be manually created by the user of the flash drive and computer, and both contained documents authored by Koch and digital photographs of Koch within days of when numerous images were saved, moved, or deleted. *Id*.

Here, count 2 charged possession of the Memorex CD-R, which did not contain any name, much less Manning's or a variation of his name, such as MEM659, the user name he used for login on his laptop. As mentioned, there were no folders that were manually created on the CD-R; though this does not disaffirm that *someone* knowingly put the files there, it certainly does not even suggest Manning was that person. Finally, no personal documents or photographs were found on the CD-R, like were found in *Koch*, that could be used to demonstrate that, at some point, Manning created or possessed the CD-R. There is simply no extrinsic evidence that proves Manning knowingly possessed the CD-R. *Cf. U.S. v. Acosta*, 619 F.3d 956, 961 (8th Cir. 2010) (upholding possession conviction based on defendant's uninterrupted presence in the house, exclusive control of the seizure location, fingerprints on CD labels, and handwriting on materials). Individually, these factors cast uncertainty on the notion that Manning knowingly possessed the CD-R; taken collectively, however, and the uncertainty coalesces into veritable reasonable doubt. The government's sole evidence of knowing possession – the bare fact of the CD-R's supposed location at the alleged time of

43

seizure – is insufficient to convict Manning of possession beyond a reasonable doubt.

II.  THE CONVICTIONS FOR BOTH RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY CONSTITUTES DOUBLE JEOPARDY.

The Double Jeopardy Clause bars the imposition of "[m]ultiple punishments for the same criminal offense.  *U.S. v. Muhlenbruch*, 643 F.3d 987, 1002 (8th Cir. 2011) (citation omitted).  Double Jeopardy prevents the conviction of two offenses that are "in law and fact the same offense."  *Id*. at 1002.  If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Blockburger v. U.S.*, 284 U.S. 299, 304 (1932).

In *Muhlenbruch*, the Eighth Circuit Court of Appeals held that possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B) is a lesser-included offense of receiving child pornography under 18 U.S.C. § 2252A(a)(2); a decision echoing the conclusions of other circuits.  634 F.3d at 1003; *See also U.S. v. Bobb*, 577 F.3d 1366, 1374-75 (11th Cir. 2009), *U.S. v. Miller*, 527 F.3d 54, 71-72 (3rd Cir. 2008), and *U.S. v. Davenport*, 519 F.3d 940, 943-948 (9th Cir. 2008).

Here, although the indictment charged different images for receipt and possession, the conduct sought to be punished was the same.  The knowing receipt of child pornography charged in Count 1 on the hard drive necessarily entails

44

knowing possession – it is physically impossible to receive something without simultaneously possessing it. Additionally, the possession of child pornography charged in Count 2 necessarily implies the receipt of the same child pornography – the government did not aver that the Memorex CD-R appeared out of thin air in Manning's desk, nor did the government argue that Manning produced the child pornography found on the CD-R; therefore, he must, necessarily, have received it.

The Eighth Circuit in *Muhlenbruch* held that the double jeopardy violation was plain error. 634 F.3d at 1004. Although the sentences in *Muhlenbruch* ran concurrently, the court also found that the double jeopardy violation affected Muhlenbruch's substantial rights. *Id*. Here, Manning's substantial rights are even more grievously affected because the district court sentenced Manning to consecutive sentences, resulting in literal multiplicitous punishment for the same conduct. *See* Document 102. The "prohibition against double jeopardy is a cornerstone of our system of constitutional criminal procedure" and, therefore, "this error threatens the fairness, integrity, and public reputation of our judicial proceedings." *Davenport*, 519 F.3d at 947-948. To prevent a grave injustice and ensure fair judicial proceedings, at least one of the convictions must be vacated, along with the corresponding sentence.

III. THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING THE CHAT TRANSCRIPTS INTO EVIDENCE OVER MANNING'S HEARSAY OBJECTION.

45

The Gigatribe and the Yahoo chat evidence that was found on Manning's computer were admitted as government's exhibits 52A-P and 53A-D, respectively, over Manning's objections to hearsay. In addition to admitting the transcripts of the chats, the government had the computer forensic examiner Grimm read material portions of each chat, and also offer testimony as to the meaning of the chats. The nature of the chats ranges from relatively innocuous to explicitly graphic.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Federal Rule of Evidence 801(c). Here, there are two distinct categories of statements contained within the chats: those from boost_virgin to another user, and those from another user to boost_virgin. The court committed prejudicial error in overruling Manning's hearsay objections to both categories of statements, and admitting them into evidence.

Both categories of statements were made while the computer users were chatting on their computers; thus, all of the statements were "other than [those] made by the declarant while testifying at the trial." *Id*. The identification of the declarant of each statement is relevant to assess the government's proffered responses to the hearsay objections.

46

Regarding the statements from boost_virgin, the government contended that these statements were made by Manning, and were therefore admissions by a party opponent. The judge, in her ruling admitting the statements, however, made no preliminary finding of fact under Federal Rule of Evidence 104(a) as to the identification of the declarant as Manning. The admission of such evidence for the truth of the matter asserted, in the absence of such a finding, is error and an abuse of discretion. Furthermore, the government did not introduce sufficient evidence to establish by a preponderance of evidence that boost_virgin was Manning. *See Bourjaily v. U.S.*, 483 U.S. 171, 175 (1987).

Although the government may contend that the presence of the chats on Manning's computer is sufficient proof that Manning is boost_virgin, that claim is insufficient given the facts of the case to prove by a preponderance of the evidence that Manning is boost_virgin. As noted by Grimm, anyone with a reasonable familiarity with Manning could have offered the identifying information upon which the government relied to establish that boost_virgin was Manning. Furthermore, Manning testified that Sara had access to the house and that he suspected her being at the house while he was away; Grimm and Becker also testified to the existence of remote access software that would allow a remote user to control the targeted laptop. No remote access software was found, however Grimm conceded that he did not look extensively for it, and that it is typically

47

designed to avoid detection. The evidence put forth not only suggests that it was possible for someone else to be responsible for the chats, but also that an identifiable person, Sara Manning, had the motive (a contentious divorce) and the opportunity (known password, access to house, and access to wireless internet) to engage in the chats. The government did not prove by a preponderance of the evidence that Manning was boost_virgin and, therefore, the invocation of admission by a party opponent was misplaced.

In overruling Manning's hearsay objection, the court ruled that the statements were not being offered for the truth of the matter asserted, but rather to "establish the identification of the defendant as boost_virgin and as somebody who has knowledge of child pornography and who has viewed child pornography." TR., Vol. II, p. 317. The court's ruling, however, is inherently contradictory. The only way statements such as "Mike from MO" can establish the identification of Manning as boost_virgin is if they are offered for the truth of the statement, namely that boost_virgin *actually is* "Mike from MO." Such a statement contains no independent relevance apart from the truth of the matter. The assertion that the statements go toward Manning's knowledge only build upon the inherent contradiction in admitting the statements not for their truth but to identify the speaker – the statements may only be relevant to show Manning's knowledge if the predicate fact of boost_virgin's identity as Manning is established. The only way

48

that is established is to offer the statements for the truth of the matter that they assert.

The erroneous hearsay ruling becomes even more problematic when considering the second category of statements, those from other users to boost_virgin. Just as with the statements by boost_virgin, the only way the second category of statements is relevant to identification or knowledge is to offer them for the truth of the matter asserted. Importantly, though, the only identification or knowledge that the statements implicate would be that of the speaker, the users other than boost_virgin. So not only were the statements actually offered for their truth, and thus hearsay, but the truth of the matter asserted did not correspond with the basis for the ruling allowing the chats into evidence, because they only implicate the other speaker's identification or knowledge.

The error having been established, the prejudice resulting from the admission of the extensive and graphic chats is evident. The chats were the only evidence that the government put forth which purported to place Manning at the computer at the time of transmission of child pornography; the chat evidence was the fundamental underpinning of the receipt charge. The use of inadmissible evidence, which was primarily instrumental in the conviction on the receipt charge, was undoubtedly prejudicial. Furthermore, the nature of many of the chats was graphic, explicit, inflammatory, and disturbing. The jury was inundated by chat

49

after chat referencing such things as knocking up a crack whore in order to take the kid and run, praise for Michael Devlin, who made national news for kidnapping a child and evading arrest for many years, and sexually abusing young boys. The nature, volume, and integral nature of the chats to the government's case all establish that the error to admit the hearsay chats was prejudicial and an abuse of the court's discretion.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTING THE MEMOREX CD-R INTO EVIDENCE OVER MANNING'S FOUNDATION AND CHAIN OF CUSTODY OBJECTION.

The government admitted the Memorex CD-R as government's exhibit 4 over Manning's objection to foundation and chain of custody. In an attempt to lay the foundation for the introduction of the Memorex CD-R, the government called Matt Corbett, Rebecca Biermann, Cara Wood, and Charles Subke. Corbett, Biermann and Subke executed the search warrant, during which the CD-R was allegedly found. Steven Grimm testified to the contents of the disc.

Corbett testified that the search warrant was executed on Manning's residence at 25 Sauk Court on September 25, 2010. Corbett was in charge of searching the back of the house, away from the desk, and logging the evidence seized. He stated that Biermann was the officer who seized the jewel CD cases; she stated the jewel cases were found in the desk. Upon seizing the jewel cases, neither Biermann nor Corbett opened the cases to check the contents of the jewel

50

case. Corbett admitted that it was a mistake not to open the cases, and that it was not in accordance with his practice of seizing CDs to not do so.

Corbett recorded the brands of the CDs visible in the jewel cases as Maxell and TDK and sealed the cases in an envelope that was left in his office for several days, after which they were turned into the evidence custodian, Maxine Eckelkamp. An evidence log was created, listing Item B as "two (2) CD-R's: one of them is a TKD [sic] brand and the other is a Maxell brand (2)" passing from Matt Corbett to Maxine Eckelkamp, on September 28, 2010. *See* Defense Exhibits C and D. The next transmission of Item B occurred on October 14, 2010 from Eckelkamp to Biermann. *See* Defense Exhibits C and D. Following this transmission of evidence, the two evidence logs show differing transactions.

Exhibit C shows Biermann giving Item B to Cara Wood at RCCEEG on October 14, 2010. Wood testified that it was at this time that she noticed a third CD, behind the Maxell CD, and she altered the description of Item B on the evidence log to reflect "three (3)" CD-R's. She did not record the brand name of the third CD, though if it was the Memorex CD-R as the government claims, it was a different brand from the two brands listed for Item B on the evidence log. The final recorded transmission of Item B on the exhibit C evidence log shows Item B moving from Rebecca Biermann to Maxine Eckelkamp on April 7, 2011. Missing is the transmission from Cara Wood back to Biermann.

51

Exhibit D skips to January 3, 2012 for the third transmission of evidence on the evidence log. However, the final two transmissions of evidence do not list Item B as being transferred; the third transmission lists Item A (the laptop) and the fourth transmission does not list any items as transferred, though it is recording some transmission, supposedly. This evidence log contains the most recent dates, however it still depicts Item B as "two (2)" CD-R's, and contains no mention of a Memorex CD-R.

Importantly, Grimm's name does not appear on either evidence log, exhibit C nor exhibit D, despite his testimony regarding the investigation and contents of the Memorex CD-R. So not only do the evidence logs not show the existence of a Memorex CD-R *anywhere*, *ever*, but also the government's key witness regarding its contents is never recorded as having received the "three (3)" CD-R's.

The Memorex CD-R did not have any handwriting or labels on it. The case containing the discs was not fingerprinted, and the Memorex CD-R, when it was later initially discovered, was never fingerprinted. The entire evidentiary basis for count 2 is *never* depicted as being within police custody, according to the evidence logs. This is not the type of reliable, credible evidence that should be permitted into evidence, or allowed to serve as the basis for conviction and revocation of an American's freedom for ten years. The court abused its discretion in admitting

52

exhibit 4, the only evidence on count 2, into evidence and thereby committed prejudicial error.

## V. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING A SUBSTANTIVELY UNREASONABLE SENTENCE ON MANNING.

### A.    Introduction

In rejecting Manning's objection to the Presentence Investigation Report and imposing a 360-month sentence, the district court failed to address the disconnect between Sentencing Guidelines § 2G2.2 and the sentencing standards in 18 U.S.C. § 3553(a).  In summarily dismissing Manning's arguments in his objections to the Presentence Investigation Report, the district court committed clear error of judgment by relying too heavily on the sentencing range produced by application of USSG § 2G2.2.  Thus, the district court abused its discretion and imposed a sentence that is substantively unreasonable.  *See Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Bain*, 586 F.3d 634, 641 (8th Cir. 2009); *United States v. Haack*, 403 F.3d 997, 1004 (8th Cir. 2005).

### B.    The December 11, 2012 Sentencing Hearing

After the district court summarized Manning's objections to the PSI, it offered the parties the opportunity for further argument.  The government introduced the testimony of Pamela Musgrave who testified that she conducted interviews of Manning's children concerning allegations of sexual abuse.  A videotape was played of the interviews, in which both of Manning's sons claimed

53

that they had been touched by Manning.  Following the testimony, neither side

offered further argument.  The district court then denied Manning's objections and

sentenced him to 360 months.

### C.    Section 2G2.2's History

Section 2G2.2 reflects the persistent effort of a few members of Congress to

press their political judgments about the merits of increased penalties for child

pornography crimes rather than the Sentencing Commission's careful effort to

apply indepent expertise to national experience and empirical data.  *See* Troy

Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed

Progression of the Child Pornography Guidelines* (available at

http://www.fd.org/odstb_SentencingResource3.htm#DECONS) [hereinafter

"Stabenow Study"].  Accordingly, § 2G2.2's recommendations bear little relation

to § 3553(a) factors and purposes.  Section 2G2.2 crudely and mechanicistically

punishes even first time offenders such as Manning very near or at the statutory

maximum sentence, a result inconsistent with § 3553(a)'s command that this court

impose a sentence "sufficient, but not greater than necessary…"  18 U.S.C. §

3553(a).

In the decade between 1997 and 2007, sentences for child pornography

offenders increased 443%.  *See* Stabenow Study at 2-3.  The changes to the

sentencing guidelines that produced this increase

Appellate Case: 13-1016    Page: 63    Date Filed: 03/27/2013 Entry ID: 4018910

"are largely the consequence of numerous morality earmarks slipped into larger bills over the last fifteen years, often without notice, debate, or empirical study of any kind. Congressionally mandated changes were even enacted to prevent the Commission from implementing carefully considered modifications which would have *lowered* applicable offense levels." *Id*. at 3.

In 2004, the Sentencing Commission eliminated § 2G2.4, consolidating it with § 2G2.2 to reconcile provisions of the Protect Act. This change brought about the guideline currently applicable to Manning and under which his offense level was computed in his PSI for a total offense level of 47 and a sentencing range of life, reduced to offense level 43 pursuant to Chapter 5, Part A (comment n.2) for a statutory maximum of 10 years on the possession count and maximum of 20 years on the receipt count, totaling 360 months. *See* PSI at 7. In the thirteen years between 1991 and 2004, the penalties applicable to the facts of Manning's case have added 10 years at the low end and more than 12 years at the high end without any evidence that these increases reflect any § 3553(a) consideration or purpose. *See* Stabenow Study at 5-24; Sentencing Guidelines, Sentencing Table.

The present version of § 2G2.2 is not the product of any empirical research establishing that the current punishment is necessary or effective for the sentencing purposes detailed in § 3553(a), such as deterring offenders or protecting the public. *See* 18 U.S.C. § 3553(a)(2). In the absence of evidence to suggest that public protection, deterrence, or rising recidivism require sentences near, at, or above

55

statutory maximum levels it is difficult to disagree with the district court in *U.S. v. Cruikshank*,

> Possessors of child pornography are modern-day untouchables. We cannot fathom how they can be aroused by images of prepubescent children being brutalized. And, because we cannot imagine that we personally know anyone so perverted, we are not bothered by the idea that these men are cast out to serve long periods in prison … And, wanting to punish someone for the crimes that these horrible images embody, society seeks harsh sentences for anyone who participates in this market. Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers. The resulting punishment under the Guidelines may be more a reflection of our visceral reaction to these images than a considered judgment of the appropriate sentence for the individual. 667 F.Supp.2d 697, 703 (S.D.W. Va. 2009).

Such concern has led courts to recognize the disconnect between the statutory requirements in 18 U.S.C. § 3553(a) and the results produced by § 2G2.2. For example, the Second Circuit has commented that § 2G2.2 is "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553(a) requires. *U.S. v. Dorvee*, 616 F.3d 174, 184 (2nd Cir. 2010). The average sentence for child pornography offenses in fiscal year 2010 was 120.1 months, a higher average than for the commission of contact sexual abuse – 113. 8 months, manslaughter – 73.5 months, robbery – 80.8 months, and arson – 78.2 months. *See* United States Sentencing Commission, *U.S. Sentencing Commission's 2010 Sourcebook of Federal Sentencing Statistics* at Table 14.

56

**D.     Manning's 360-month Sentence is Substantively Unreasonable**

A review of the statistics produced by the Sentencing Commission for fiscal year 2010 reveals that of the 1,711 defendants sentenced under 2G2.2, 96.6% received a number of images enhancement, 96.2% received the use of a computer enhancement, 95.6% received an enhancement for having at least one image of a person under age 12, and 73.7% possessed at least one image containing sadistic or masochistic conduct.  U.S. Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010* at 37.  All of these specific characteristics applied in Manning's case, which amply demonstrates that his was a mine-run case that § 2G2.2 anchors at or beyond the statutory maximum.  An offense guideline's specific offense characteristics exist to highlight facts that aggravate or mitigate a particular offense.  M. Schanzebach & Tiller, *Reviewing the Sentencing Guidelines: Judicial Politics, Empirical Evidence and Reform*, 75 U. Chi. L. Rev. 715, 726 (2008).

Section 2G2.2's specific offense characteristics, however, do nothing to differentiate between minor and aggravated offenders.  Instead, they simply pile on punishment so that even a first offender like Manning receives a sentencing range beyond the statutory maximum.  Document 97 at 7.  Manning's conduct was typical and deserving of a sentence of the statutory maximum only if all child pornography possession and receipt cases require sentences near the statutory

57

maximum. Such a rule, however, conflicts with both § 3553(a)'s focus on the individual defendant and the Supreme Court's holding that sentencing courts "make an individualized assessment based on the facts presented." *Gall*, 522 U.S. at 46. Anchored to the numbers produced by application of § 2G2.2 – numbers that have little, if anything, to do with actual culpability and the sentencing purposes expressed in § 3553(a) – the district court abused its discretion and committed plain error. By imposing a 360-month sentence on a first-time offender, imprisoning him for the remainder of his healthy adult life, the district court committed a clear error of judgment.

## CONCLUSION

For the reasons expressed and argued in this Brief, Defendant-Appellant Manning respectfully requests that the Court find in the following order, with each subsequent part requested only if the prior request is denied:

a.   That there was insufficient evidence to convict Manning beyond a reasonable doubt of either charge and vacate both convictions;

b.   That the district court abused its discretion and committed prejudicial error in admitting the chat evidence over Manning's hearsay objections and vacate the conviction for receipt of child pornography;

58

c.      That the convictions for both receipt and possession of child

pornography constitutes double jeopardy and remand to the district

court for its decision to vacate one of the convictions;

d.      That the district court abused its discretion and committed prejudicial

error in admitting the Memorex CD-R over Manning's foundation and

chain of custody objections and vacate the conviction for possession

of child pornography;

e.      That the district court's 360-month sentence is substantively

unreasonable and remand the case for re-sentencing.


Dated March 27, 2013.

Respectfully submitted,

/s/ Kenneth R. Schwartz_____
Kenneth R. Schwartz
7751 Carondelet, Suite 204
St. Louis, Missouri 63105
(314) 863-4444

Attorney for Defendant-Appellant Manning

Appellate Case: 13-1016    Page: 68    Date Filed: 03/27/2013 Entry ID: 4018910

## PROOF OF SERVICE

I hereby certify that on March 27, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/EMF users and that service will be accomplished by CM/EMF system.


/s/  Kenneth R. Schwartz

Kenneth R. Schwartz


## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(b), the undersigned hereby certifies that this Brief complies with the type-volume limitation.  The number of words contained in this Brief (with the count beginning at the Jurisdictional and ending before the signature block) , typed in Microsoft Word 2011, is 13,708.


/s/  Kenneth R. Schwartz

Appellate Case: 13-1016    Page: 69    Date Filed: 03/27/2013 Entry ID: 4018910

Kenneth R. Schwartz

<u>ADDENDUM</u>

Judgment in a Criminal Case………………………………………………………1

Appellate Case: 13-1016    Page: 70    Date Filed: 03/27/2013 Entry ID: 4018910